EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
SARAH J. HEIDEL (Cal. Bar No. 209886)
BYRON J. MCLAIN (Cal. Bar No. 257191)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2451/0637
    Facsimile: (213) 894-6269
    E-mail:    Sarah.heidel@usdoj.gov
            Byron.mclain@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-00489-GW |
|---|---|
| Plaintiff, | GOVERNMENT RESPONSE TO DEFENDANT'S SENTENCING POSITION; DECLARATION OF SARAH J. HEIDEL; EXHIBITS 1-5 |
| v. | |
| BRUCE RICHARD SANDS, | Hearing Date: July 28, 2016 |
| Defendant. | Hearing Time: 8:00 a.m. |
| | Location:    Courtroom of the Hon. George H. Wu |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Sarah J. Heidel and Byron J. McLain, hereby files its Response to Defendant Bruce Richard Sands' Sentencing Position.

    This Response is based upon the attached memorandum of points and authorities, the declaration of Sarah J. Heidel, the attached

exhibits, the files and records in this case, and such further
evidence and argument as the Court may permit.

Dated: July 26, 2016                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        _____/s/ Byron J. Mclain_____
                                        SARAH J. HEIDEL
                                        BYRON J. MCLAIN
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

TABLE OF AUTHORITIES....................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.....................................1

I.    INTRODUCTION......................................................1

II.   ARGUMENT.........................................................2

      A.    The Defendant is Responsible for All Losses Associated
            with His Gold Investment Fraud Scheme......................2

      B.    The Government Clearly Has Shown That A +20 Loss
            Enhancement is Applicable for More than $9,500,000 in
            Losses....................................................3

      C.    The Government Has Clearly Shown That A +6 Enhancement
            is Applicable for 25 or More Victims Suffering
            Substantial Financial Hardship............................6

      D.    The Relevant Section 3553(a) Factors Do Not Support a
            Sentence Below the Advisory Guidelines....................8

            1.    Defendant's Caretaker Role Does Not Justify a
                  Variance............................................8

            2.    Defendant's Alleged Childhood Abuse Does Not
                  Justify a Variance..................................9

            3.    The Nature and Circumstances of Defendant's
                  Offense is a Relevant Aggravating Factor...........10

            4.    Defendant's Age is Not an Appropriate
                  Consideration......................................11

            5.    Sentencing Defendant to 151 Months Avoids
                  Sentencing Disparities.............................11

            6.    Defendant's Ability to Pay Restitution Does Not
                  Justify a Sentence Below 151 Months Imprisonment....14

III. CONCLUSION.......................................................16

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**CASES**

Kelly v. Robinson,
    479 U.S. 36 (1966)........................................16

United States v. Becerril-Lopez,
    541 F.3d 881 (9th Cir. 2008)............................13

United States v. Blitz,
    151 F.3d 1002 (9th Cir.1998)............................2

United States v. Bolden,
    889 F.2d 1336 (4th Cir.1989)...........................16

United States v. Chastain,
    84 F.3d 321 (9th Cir. 1996)............................15

United States v. Cloud,
    872 F.2d 846 (9th Cir. 1989)...........................16

United States v. Davis,
    537 F.3d 611 (6th Cir. 2008)...........................11

United States v. Green,
    592 F.3d 1057 (9th Cir.2010)...........................13

United States v. Hannes Tulving, Jr.,
    No. 15-CR-00115-MOC....................................13

United States v. Harpst,
    949 F.2d 860 (6th Cir. 1991)...........................16

United States v. Johnson,
    132 F.3d 1279 (9th Cir. 1997)...........................3

United States v. Laurienti,
    731 F.3d 967 (9th Cir. 2013)...........................10

United States v. Levinson,
    543 F.3d 190 (3d Cir. 2008).............................8

United States v. Saeteurn,
    504 F.3d 1175 (9th Cir. 2007)..........................12

United States v. Treadwell,
    593 F.3d 990 (9th Cir. 2010).......................13, 17

United States v. Tulaner,
    512 F.3d 576 (9th Cir.2008)...........................2, 3

# TABLE OF AUTHORITIES

DESCRIPTION                                                                                  PAGE

**STATUTES**

18 U.S.C. § 3553.............................................................11, 15

**Sentencing Guidelines**

U.S.S.G. § 2B1.1............................................................1, 7, 8

U.S.S.G. § 5H1.1..............................................................12

U.S.S.G. § 5H1.6...............................................................8

U.S.S.G. § 1B1.3...............................................................2

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

On July 21, 2016, the government filed its Sentencing Position agreeing with the United States Probation Office ("USPO") and requesting that the Court sentence defendant Bruce Richard Sands ("defendant") to a 151-month term of imprisonment, a three-year period of supervised release, restitution in the amount of $11,039,404.49, and a special assessment of $1,100.  (Dkt. 75.)  The government calculated the defendant's Sentencing Guidelines range of 151-188 months based on a total offense level of 34.

On July 22, 2016, the defendant filed his Sentencing Position arguing that his total offense level should be 26, resulting in a Sentencing Guideline range of 63-78 months.  (Dkt. 77.)  The defendant argues that his aggregate loss and restitution amount is "between approximately $1 million and $1.5 million," resulting in an enhancement of +14 as opposed to +20.  (Dkt. 77 at 14.)  The defendant also argues that the victim enhancement should be +4 as opposed to +6.  (Dkt. 77 at 16.)  The defendant does not argue that the USPO incorrectly applied the base offense level, the specific offense characteristic enhancement for money laundering, and the role adjustment in the offense for organizer and leader.

The government files this response showing that (i) the USPO correctly applied the appropriate loss and restitution calculation of $11,039,404.49 for a +20 enhancement under U.S.S.G. § 2B1.1(b)(1)(K); (ii) the USPO correctly applied the +6 enhancement for at least 25 victims suffering substantial financial hardship under U.S.S.G. § 2B1.1(b)(2)(C); and (iii) no variance is warranted for defendant's

1

sentence after both mitigating and aggravating factors are considered.

**II.   ARGUMENT**

   **A.   The Defendant is Responsible for All Losses Associated with His Gold Investment Fraud Scheme**

The defendant argues that his loss and restitution obligations should be limited to the losses associated with the 11 mail fraud and money laundering counts to which he pled guilty.  (Dkt. 77 (Defendant's Sentencing Position) at 13-14.)  Defendant is wrong. The Ninth Circuit has repeatedly found that each count of mail fraud incorporates the entire scheme.  Each count of mail fraud is made up of both the scheme to defraud and the act in furtherance.  See United States v. Blitz, 151 F.3d 1002, 1011 (9th Cir. 1998).  Encompassed in each count is the entire scheme, and thus loss is not limited to the count that describes an act in furtherance of the scheme, as codified in USSG § 1B1.3(a)(1).

An example of this principle is United States v. Tulaner, 512 F.3d 576 (9th Cir. 2008).  In that case, the defendant schemed to defraud a manufacturing company, JMI, out of 12 items of its product ("platinum sputtering discs").  JMI agreed to ship these things in three batches, assuming payment for each batch after it was received before sending the next batch.  JMI caught on before shipping any sputtering disks that the defendant was trying to scam them, and got the FBI involved.  The defendant was arrested after he received the first shipment in a controlled delivery.  Id. at 577-78.  The defendant pled guilty to one count of wire fraud in connection with a telephone call on the date of his arrest, relating to the four sputtering discs he thought had been shipped.  Id. at 580.  He argued

2

1    his loss should be limited to the value of those four discs.  The

2    Ninth Circuit disagreed, holding that the wire transaction to which

3    the defendant pled guilty was part of the overall scheme, and that

4    thus the entire amount of loss from the scheme counted:

> As described in the superceding indictment, the relevant
> "scheme to defraud" for purposes of the wire fraud count
> involved obtaining twelve sputtering discs.  The phone call
> in furtherance of that scheme, even if only related to
> shipment of four discs, completed the offense.

8    Id. at 580.  The same principle applies to restitution as well.  See

9    United States v. Johnson, 132 F.3d 1279, 1286-87 (9th Cir. 1997)

10   (because the offense included as an element a scheme to defraud,

11   restitution was properly ordered for the entire loss from the scheme

12   and not just for the count to which the defendant pled guilty.)

13   Thus, the defendant is responsible for the full $11 million in losses

14   and restitution for the entire scheme; not just for the losses

15   associated with the counts for which he pled guilty.

16          **B.   The Government Clearly Has Shown That A +20 Loss**
                   **Enhancement is Applicable for More than $9,500,000 in**
17                 **Losses**

18        The defendant argues that the government has failed to meet the

19   "clear and convincing" standard to show that a +20 enhancement is

20   applicable for $11,039,404.49 lost from over 300 victims based on

21   defendant's conduct.  The government actually has met this burden.

22        ***First***, on April 14, 2016 the defendant admitted in his own

23   statement to the fraudulent conduct alleged in the scheme.  (Dkt.

24   68.)  Defendant admitted in part that he "knowingly participated in a

25   scheme to defraud by falsely misrepresenting to victim-

26   purchasers...the date by which victim purchasers would receive their

27   precious metals and the reason why the victim-purchasers had not

28   received the previous metals they had paid for." (Dkt. 68 at 3.)  He

admitted that he did not tell the victims that "a substantial portion of their specific purchase monies, if not all of it, would not be used to buy precious metals and a number of earlier purchasers of metals from the Superior Gold Companies had not received their precious metals in the time frame called for by the Superior Gold Companies' contract." (Id.)  Defendant even admitted that he "made these material statements and omissions with the intent to defraud." (Id.)

The 11 counts that defendant pled guilty to range from as early as August 6, 2008 to August 30, 2010 – over a two-year time span – indicating that defendant's intent to defraud the victim investors was long-lasting.  Thus, by defendant's own admission, his fraudulent conduct was not a blimp in time, but an ongoing effort to defraud the victim investors totaling over $11 million.

**Second**, as a specific requirement of each victim purchasing gold from the defendant, they had to sign a contract that indicated the victims would receive their gold within approximately 30-45 days (i.e., a statement the defendant admitted was a material misstatement with the intent to defraud investors).  (See Exhibit ("Exh.") 1 at 6.)  As an under seal exhibit to its sentencing position, the government provided a detailed spreadsheet identifying approximately 270 victims who received no metals in return for their investments. (Dkt. 76, Heidel Declaration ("Decl."), ¶ 2, Exh. A).  These victims alone suffered an investment loss of $10,203,999.72 because they did not receive any metals or Investment Retirement Account ("IRA") funding with metals from SGG.  (Id.)  Thus, the +20 enhancement is clearly and convincingly applicable for a loss over $9.5 million based on this analysis alone.

**Third,** based on a thorough analysis of defendant's personal and Superior Gold Group ("SGG") bank records, defendant received over $24 million from individuals purchasing gold during the timeframe of the scheme from November 2007 to February 2010.  (See Exh. 2 at 2-24.)  Yet, defendant only spent approximately one-third of the individuals' money (i.e., $8,448,889,16) on actually purchasing gold.  (Id. at 2 & 25-28.)   Instead, the defendant wasted the victims' investment money on advertisements to promote his fraudulent conduct (id. at 28-40), transferred the victims' money into his own personal bank accounts (id. at 65-68) and spent the victims' money on his own lavish lifestyle (id. at 69-73).

In particular, as opposed to purchasing gold for the victim investors, defendant spent the victims' money on personal car payments for a Lamborghini; the purchase of a $51,500 Bentley; a $16,000 payment on a Lexus; a $28,000 payment for a Hummer; a $14,400 payment for a watch; a $53,500 payment for a Porsche; a $12,352 payment for a Chevy Avalanche; a $15,500 payment for a Ford Fusion; $10,000s in various personal residence mortgage payments; $1,000s in ATM transactions; and many other extravagant payments to himself and family members.  (Id. at 69-73.)  In particular, as of June 2016, defendant lived in "a five bedroom, five and a half-bathroom, single family residence in a gated, golf course community."  (Revised PSR ¶ 84.)  As a result of defendant's fraudulent conduct, while defendant was living the "high life," the victims lost over $11 million.

**C.    The Government Has Clearly Shown That A +6 Enhancement is Applicable for 25 or More Victims Suffering Substantial Financial Hardship**

The defendant argues that the government has failed to meet its burden to show that 25 or more victims suffered substantial financial hardship as a result of defendant's scheme.  Defendant is incorrect as the government has met this burden.  The defendant also argues that the government must meet a clear and convincing standard that 25 or more victims have suffered substantial harm.  The government has meet this standard as well.[1]

Under the Sentencing Guidelines, six levels are added if the offense resulted in hardship to 25 or more victims.  Factors to be used in determining whether the offense resulted in "substantial financial hardship" include when the offense results in the victim:

> (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code . . . (iii) suffering substantial financial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1(b)(2)(C) at Appl. Note 4(F).

***First***, in order to convincingly show this harm, the government interviewed more than 25 victims that specifically identified the "substantial financial hardship" they received as a result of defendant's conduct.  (Dkt. 76, Under Seal Filing, Heidel Decl., Exh. C.)  As some examples, victim D.D. said "the money invested [in Superior Gold] totaled 95% of [his] entire retirement savings" and

---

[1] The government does not agree that it must meet a "clear and convincing" standard for a 2-level aggravating offense enhancement, but nevertheless it has met this standard.

"he no longer has a college fund for his children." (Id.) Victim R.B. said the funds invested "totaled 100% of his entire savings." (Id.) Victim D.S. said "he invested approximately $124,000 in a self-directed [retirement] IRA...and his account was never fulfilled." (Id.) Victim G.L. stated that she liquidated all her accounts for the purchase and stated it 'destroyed' her retirement." (Id.) Victim S.M. stated "the investment was 95% of his entire savings at the time." (Id.) Each of the victim interviews conducted by the investigative agents in this case indicate similar stories of substantial financial hardships suffered from victims. (Id.) The government also has provided over 20 additional victim statements identifying the heart-wrenching impact that the defendant's conduct has had on the lives of these victims, thus justifying the +6 enhancement for 25 or more victims suffering substantial financial hardship. (Exh. 3.)

**Second**, a large portion of defendant's business model for SGG was to convince victims to purchase gold specifically using their <u>retirement funds</u> through IRA investment transactions. (Revised PSR ¶ 11.) As a result, approximately 190 victims purchased gold from defendant using their retirement (<u>i.e.</u>, IRA) funds. Based on the "Summary of Losses" chart created by the investigative agents, these victims did not receive anything in return for their investments from their retirement funds. They lost everything they invested. As a result, all of these 190 victims meet the criteria for suffering "substantial financial hardship" because they suffered substantial financial losses of their retirement funds. Therefore, the Revised PSR is correct to apply a six-level enhancement under U.S.S.G.

§ 2B1.1(b)(2)(B) because defendant caused twenty-five or more victims to suffer "substantial financial hardship." (Revised PSR ¶ 44.)

### D. The Relevant Section 3553(a) Factors Do Not Support a Sentence Below the Advisory Guidelines

The government believes that a 151-month sentence is sufficient but not greater than necessary to comply with the purposes of the factors set forth in 18 U.S.C. § 3553(a).

#### 1. Defendant's Caretaker Role Does Not Justify a Variance

Family ties and responsibilities are not ordinarily relevant to determining whether a sentencing departure may be warranted. See U.S.S.G. § 5H1.6. A defendant whose family will suffer in his or her absence is not unique among white-collar criminals, and should not compel a court to stray from imposing the Sentencing Guidelines' recommended prison time. United States v. Levinson, 543 F.3d 190, 198-200 (3d Cir. 2008) (finding that considering the district court's proper acknowledgement that defendant was not atypical in regard to the effect his incarceration would have on his family, defendant naturally would have fallen within the Guidelines). Defendant argues that he is the sole caretaker for his 10-year old son and therefore requires a substantial variance in his sentence to care for his son based on § 3553(a) factors. Such a variance is unwarranted.

***First***, even though defendant's youngest son lives with him, the defendant's ex-wife (Darlan Martinez) has joint physical custody of their child. (Revised PSR ¶ 83.) She can assume the responsibility for raising her son while the defendant is incarcerated. ***Second***, defendant lives with his eldest son (Daniel Sands), who is a 29-year old adult. (Id.) Daniel Sands can assist in raising his younger brother during the defendant's anticipated incarceration. ***Third***,

8

defendant acknowledges that he has a fiancé, Leslie Perry, and a "countless number of friends." (Dkt. 77-1 at 28.) Ms. Perry in particular, and many of these friends as well, can assist in raising the defendant's 10-year old son. Defendant's youngest son has a strong network of support in place. In sum, there is no justification for a variance because defendant is not the sole caretaker for his child and a village of people are available to help raise defendant's son.

In mitigation, defendant appears to have been a steady, positive presence in his youngest son's life – as he should be. However, clearly defendant has been living a dual life: (i) one as a loving and supportive father and friend to many, and alternatively, (ii) as a fraudulent criminal victimizing hundreds of others. In addition, statements assuming that defendant's son will "likely end up on the wrong side of the law" simply because the defendant is incarcerated are hyperbolic and overstated. (Dkt, 77-1 at 21.) Instead, perhaps defendant's child will learn that there are strong consequences to criminal conduct, and he will avoid the same fraudulent conduct that his father engaged in for so many years.

2.   Defendant's Alleged Childhood Abuse Does Not Justify a Variance

Defendant alleges physical abuse from his father, but he does not provide any specifics. (Dkt. 77 at 21.) Defendant also has a significant history of fraud-related offenses that are aggravating factors against any variance for alleged childhood abuse. (Revised PSR ¶¶ 57-75.)

3.    <u>The Nature and Circumstances of Defendant's Offense is a Relevant Aggravating Factor</u>

The majority of circuits agree that because of the seriousness of white-collar crime and the general need for deterrence, it is substantively unreasonable to afford a white-collar offender a lenient sentence that does not include substantial incarceration. <u>See</u> <u>United States v. Laurienti</u>, 731 F.3d 967, 976 (9th Cir. 2013) (holding that defendant's sentence of thirty-six months' imprisonment and three years' supervised release, which fell in the middle of the Guidelines range, was reasonable and was not subject to downward variance because "[defendant] engaged in fraudulent conduct, including unauthorized trading in clients' accounts, for approximately two years" and "the mitigating factors he cites are either accounted for by the Guidelines (lack of criminal history) or common among white-collar defendants (community and family support)"); <u>see also</u> <u>United States v. Davis</u>, 537 F.3d 611, 617 (6th Cir. 2008) ("One of the central reasons for creating the Sentencing Guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes.").

Here, defendant continues to fail to acknowledge the full scale and scope of his white collar criminal conduct. ***First***, defendant claims he did not enter the gold business with the intent to defraud his customers and that approximately 1,500 customers were satisfied with defendant's services. Yet, defendant does not provide a scintilla of evidence to support such a blanket statement. (Dkt. 77 at 8.) To the contrary, defendant's own admission in this court indicates that he defrauded his customers as early as August 6, 2008

10

1  – less than one year after starting the gold business in late 2007.

2  (Dkt. 68 at 4.)  **Second**, as of 2009, defendant's past business

3  associates (e.g., Jeff Thompson) warned him about the importance of

4  honoring the customers' debts.  (Exh. 4.)  Yet, defendant continued

5  to make "empty promises" and defrauded even more customers as late as

6  August 2010.  (Exh. 4 at 4; Dkt. 68 at 5.)  Defendant's own General

7  Sales Manager at SGG (i.e., Art Jackson) stated that the defendant

8  "would use the money from new gold sales that had a markup of 300% to

9  fund older IRA accounts."  (Exh. 5 at 6.)  Art Jackson stated that

10  defendant "continued to take in new orders from customers even though

11  the old orders were not fulfilled" and that "SGG operated like a

12  Ponzi scheme."  (Id. at 10.)

13          4.   Defendant's Age is Not an Appropriate Consideration

14      Defendant argues that his age (55) – in proportion to his length

15  of potential incarceration (12.5 years) warrants consideration.

16  (Dkt. 77.)  **First**, the government just notes that defendant was in

17  his mid to late 40s when he committed the offense conduct.  Defendant

18  could have acknowledged his wrongdoing immediately, as opposed to the

19  eve of trial three years after indictment.  **Second**, the government

20  notes that the defendant cites his age as support for a departure,

21  but ignores the entire second sentence of the Sentencing Guideline

22  policy statement.  See U.S.S.G. § 5H1.1 ("Age may be a reason to

23  depart downward in a case in which the defendant is elderly and

24  infirm...").  The defendant is neither elderly nor infirm.

25          5.   Sentencing Defendant to 151 Months Avoids Sentencing
                 Disparities
26

27      Defendant makes the argument that in order to avoid sentencing

28  disparities among similarly situated defendants, the Court should

impose a sentence that falls <u>outside</u> the very Sentencing Guidelines Congress enacted to mitigate sentencing disparities.  Such an argument is contrary to the logic behind the Sentencing Guidelines.  <u>See</u> <u>United States v. Saeteurn</u>, 504 F.3d 1175, 1181 (9th Cir. 2007) ("Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing . . .")(internal quotation marks omitted).  The Sentencing Guidelines were established to ensure that nationwide, like sentences are imposed for like crimes.  <u>See</u> <u>United States v. Treadwell</u>, 593 F.3d 990, 1015 (9th Cir. 2010) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Sentencing Guidelines ranges"); <u>United States v. Green</u>, 592 F.3d 1057, 1072 (9th Cir. 2010) (sentencing guidelines exist to create national uniformity of sentencing) quoting <u>United States v. Becerril-Lopez</u>, 541 F.3d 881, 895 (9th Cir. 2008) ("[W]e have trouble imagining why a sentence within the Guidelines range would create a disparity, since it represents the sentence that most similarly situated defendants are likely to receive").

Defendant also cites <u>United States v. Hannes Tulving, Jr.</u>, No. 15-CR-00115-MOC as support for this court to impose a lenient sentence.  Defendant Tulving engaged in a gold investment fraud scheme, receiving $15 million, and ultimately was sentenced to 30 months' imprisonment.  Defendant, however, is apparently not aware of very important distinctions between the <u>Tulving</u> case and this case.

***First***, Tulving admitted his full culpability in the scheme pre-indictment.  On the other hand, defendant Sands was indicted, claimed he was not guilty to any of the charges for almost three years, pled guilty to 11 counts two weeks before trial, and still refuses to acknowledge the full extent of his criminal conduct.

1    **Second**, according to the prosecuting AUSA in the Tulving case,

2   Tulving received a five level departure in his guideline range

3   because he cooperated with the government.  Specifically, the

4   prosecuting AUSA said that Tulving provided "extraordinary

5   cooperation" and that it was "hard to imagine a case where someone

6   was more cooperative."  Tulving helped the government identify a list

7   of victims from the scheme, helped determine how much the victims

8   were owed, and helped the bankruptcy trustee liquidate assets to

9   benefit the victims.  In stark contrast, defendant Sands is still

10  trying to avoid accounting for all the losses he owes to the victims.

11  According to the Revised PSR, defendant Sands still even owes $1.8

12  million for an outstanding civil judgment and he has made no payments

13  since 2013.  (Revised PSR ¶ 101.)

14    **Third**, Tulving received an additional four level medical

15  departure for significant health problems.  He suffered a

16  debilitating stroke in 2005 and a heart attack in March 2015.

17  Defendant Sands, on the other hand, "reports that he is healthy, has

18  a history of good health, and is not currently taking any

19  medication."  (Revised PSR ¶ 101.)

20    **Fourth**, Tulving's conduct was not as aggravating in important

21  respects as defendant Sands' conduct.  The facts in the Tulving case

22  did not warrant any enhancements for (i) money laundering,

23  (ii) organizer and leader role, and (iii) 25 or more vulnerable

24  victims.  As a result, after the relevant departures for cooperation

25  and health, Tulving's guideline range was 30-37 months and he

26  received the low end of that range (i.e., 30 months' imprisonment).

27  Here, defendant Sands' guideline range is 151-188 months.  The

28  government is seeking the low end of this defendant's applicable

13

1   guideline range.   Therefore, the <u>Tulving</u> case actually supports the

2   government's sentencing recommendation.   In order to maintain

3   consistency and avoid disparities in sentencing, this court should

4   sentence defendant Sands to 151 months' imprisonment.

5           6.   <u>Defendant's Ability to Pay Restitution Does Not</u>
                 <u>Justify a Sentence Below 151 Months Imprisonment</u>

6

7       Defendant argues that incarceration will prevent him from making

8   restitution payments. (Dkt. 77 at 26.)   He argues that he "has a

9   proven record of education, training, and work history" showing he

10  can "legitimately make money" to provide restitution to the victims

11  of his crimes.   (Id.)   This argument is without merit.

12      ***First***, as mentioned <u>infra</u>, defendant has been on bond since his

13  criminal indictment and he has not made any restitution payments to

14  the victims of his civil-related offenses since 2013.   (Revised PSR

15  ¶ 101.)   Defendant also has been unemployed since 2010.   Thus, given

16  he has not used the past six years to obtain a job, the government

17  views with high skepticism that the defendant only now – pending his

18  incarceration – will achieve meaningful employment to pay restitution

19  to his victims.

20      ***Second***, even if defendant could make his restitution payments,

21  "we may not sentence a poor convict more harshly than a rich convict

22  simply because a rich convict is better able to make restitution."

23  <u>United States v. Chastain</u>, 84 F.3d 321, 324-325 (9th Cir. 1996)

24  (joining the Second, Fourth, Sixth, and Seventh circuits in holding

25  that a sentencing judge may not depart to facilitate payment of

26  restitution) (citations omitted); <u>United States v. Harpst</u>, 949 F.2d

27  860, 863 (6th Cir. 1991) ("[P]ermitting greater leniency in

28  sentencing in those cases in which restitution is at issue and is a

                                      14

meaningful possibility (_i.e._, generally white-collar crimes) would, we believe, nurture the unfortunate practice of disparate sentencing based on socio-economic status, which the guidelines were intended to supplant").

_**Third**_, defendant's argument undermines the intended purpose of restitution, which is to deter rather than to make victims financially whole.  See United States v. Cloud, 872 F.2d 846, 854 (9th Cir. 1989) ("criminal restitution is not ordered because victims have an independent legal entitlement to it but, rather, as a means of achieving penal objectives such as deterrence, rehabilitation, or retribution") (discussing Kelly v. Robinson, 479 U.S. 36, 52 (1966)); United States v. Bolden, 889 F.2d 1336, 1340 (4th Cir. 1989) ("[W]e do not think that the economic desirability of attempting to preserve [the defendant's] job so as to enable him to make restitution warrants a downward adjustment from the guidelines").

_**Fourth**_, it defies logic to offer overly lenient sentences to defendants who have defrauded victims of large sums of money in order to ease their ability to pay restitution.  See United States v. Treadwell, 593 F.3d 990, 1012 (finding that defendant's argument to this effect bordered on frivolous, and noting the importance of the court's consideration that if defendant were not incarcerated he "might resume fraudulent activities sooner, and might harm new victims sooner.").  Congress never intended for one's ability to pay restitution to alter the court's authorization of an appropriate punishment that fully accounts for the severity of the crime; the amount of restitution ordered and sentencing are two independent determinations.  See Chastain, 84 F.3d at 325 ("Finally, the Commission's decision to separate the calculation of restitution from

15

the sentencing determination evinces an intent to prevent restitution considerations from influencing the guideline sentence").

**III. CONCLUSION**

For all of the reasons stated above the government still respectfully requests that the Court sentence defendant to (1) a 151-month sentence, (2) a three-year period of supervised release, (3) restitution in the amount of $11,039,404.49, and (4) a special assessment of $1,100.

Dated: July 26, 2016                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                            /s/ Byron J. Mclain
                                        _____
                                        SARAH J. HEIDEL
                                        BYRON J. MCLAIN
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA